# Exhibit A

## LINE OF CREDIT LOAN AGREEMENT
### (Unsecured)

This Line of Credit Loan Agreement (this "Agreement") dated as of July 22, 2006, is between **BANK OF AMERICA, N.A.** ("Bank") and the following individuals and corporation (all being hereinafter collectively referred to as "Borrowers"): **FRED TEICHER, NORMA O. TEICHER, STUART TEICHER, JEREMY TEICHER, RYAN TEICHER, AND JARMISON GROUP, INC.** a New Jersey corporation (each of the foregoing Borrowers being hereinafter referred to as a "Borrower", and Jarmison Group, Inc. being hereinafter sometimes referred to as the "Corporate Borrower"). Bank has agreed to provide this line of credit to Borrower on the terms and conditions set forth herein. This line of credit is revolving and is unsecured.

1.    LINE OF CREDIT AMOUNT AND TERMS

    1.1    Line of Credit Amount.

        (a)    During the Availability Period described below, Bank will provide a line of credit to Borrowers. The amount of the line of credit is Two Million Dollars ($2,000,000.00) (the "Commitment").

        (b)    This is a revolving line of credit.   During the Availability Period, Borrower may repay principal amounts and reborrow them.

        (c)    Each advance must be for at least One Hundred Thousand Dollars ($100,000.00), or for the amount of the remaining available line of credit if less.

        (d)    The Borrowers agree not to permit the outstanding principal balance of the line of credit to exceed the Commitment.

    1.2    Availability Period. The "Availability Period" of the line of credit commences on the date of this Agreement and expires on the first anniversary date of this Agreement (the "Expiration Date") unless there is an Event of Default. If there is an Event of Default, then in addition to Bank's other remedies, Bank may terminate the Availability Period and may require Borrower to repay any amounts outstanding under the line of credit immediately.

    1.3    Interest Rate. The Borrowers are executing a promissory note (the "Note") in the amount of the Commitment evidencing the line of credit and payable to Bank. The Note sets forth the interest rate and certain other terms and conditions applicable to the line of credit.

    1.4    Loan Documents. The "Loan Documents" are the documents indicated below, each dated as of the date of this Agreement unless indicated otherwise, and all other documents now or hereafter executed in connection with the line of credit, as the same may from time to time be amended, restated, modified or supplemented. A capitalized term used in this Agreement but not defined herein has the meaning given in the other Loan Documents.

(a) This Agreement.

(b) The Note.

(c) Corporate Resolution authorizing the Corporate Borrower to borrow certified by the Corporate Secretary of the Corporate Borrower. The Corporate Resolution shall also contain a Certificate of Incumbency for the authorized signing officers, containing their specimen signatures and certified by the Corporate Secretary.

(d) A signed Borrowing Notice for each draw as required by Section 3.1(b) hereof.

## 2. FEES AND EXPENSES

2.1 Loan Fee. The Borrowers agree to pay a fee of one-half of one percent of the amount of the Commitment equal to Ten Thousand Dollars ($10,000.00) due on the date of the Borrowers' execution of this Agreement.

2.2 Expenses and Costs.

(a) The Borrowers will pay all costs and expenses incurred by Bank in connection with the making, disbursement and administration of the line of credit, and in the exercise of any of Bank's rights or remedies under the Loan Documents. Such costs and expenses include legal fees and expenses of Bank's counsel and any other reasonable fees and costs for services, regardless of whether such services are furnished by Bank's employees or by independent contractors. The Borrowers acknowledges that the other fees payable to Bank do not include amounts payable by Borrowers under this Section 2.2.

(b) The Borrowers agree to indemnify Bank from and hold it harmless against any transfer or documentary taxes, assessments or charges imposed by any governmental authority by reason of the execution, delivery and performance of the Loan Documents. Borrowers' obligations under this Section 2.2 shall survive payment of the line of credit and assignment of any rights hereunder.

## 3. DISBURSEMENTS, PAYMENTS AND COSTS

3.1 Requests for Credit.

(a) Each request for an extension of credit shall be made in writing in a manner acceptable to Bank.

(b) Borrowing Notice. Each draw request shall be made upon the irrevocable written notice of the Borrowers (including notice via facsimile confirmed by a mailed copy) in the form of a Borrowing Notice (attached hereto as Exhibit A) as follows:

2

(i)     Each Borrowing Notice shall contain a certification signed by not less than two (2) of the Borrowers (one of whom must be either Fred Teicher or Norma O. Teicher) that (A) no Event of Default, after giving effect to the requested borrowing, will exist, (B) the aggregate outstanding balance of the line of credit after giving effect to the requested borrowing will not exceed the Commitment and setting forth the basis for such calculation, and (C) the proceeds from the requested borrowing will be used only for purposes permitted under this Agreement.

(ii)    Each Borrowing Notice shall be submitted to and received by Bank prior to 9:00 a.m. (New Jersey time) at least two (2) Business Days prior to the specified borrowing date.

3.2     Disbursement and Payment Records.     Each disbursement by Bank and each payment by the Borrowers will be evidenced by records kept by Bank.

3.3     Telephone and Telefax Authorization.

(a)     Bank may honor telephone or telefax instructions for advances or repayments (or for the designation of any optional interest rates that may be permitted by the Note) given by any one of the individuals authorized to sign Loan Documents on behalf of Borrowers, or any other individual designated by any one of such authorized signers.

(b)     Advances will be deposited in and repayments will be withdrawn from an account to be opened (the "Account") with Bank as designated in writing by Borrowers.

(c)     The Borrowers indemnify and release Bank (including its officers, employees, and agents) from all liability, loss, and costs in connection with any act resulting from telephone or telefax instructions Bank reasonably believes are made by any individual authorized by the Borrowers to give such instructions. This indemnity and release shall survive the termination of this Agreement.

3.4     Direct Debit.

(a)     The Borrowers agree that payments due on the Note and any fees owed will be deducted automatically on the due date from the Account.

(b)     Bank will debit the Account on the dates the payments become due. If a due date does not fall on a Business Day, Bank will debit the Account on the first Business Day following the due date.

(c)     The Borrowers will maintain sufficient funds in the Account on the dates Bank enters debits authorized by this Agreement. If there are insufficient funds in the Account on the date Bank enters any debit authorized by this Agreement, without limiting Bank's other remedies in such event, the debit will be reversed.

(d)    Either the Borrowers or Bank may terminate this direct debit arrangement at any time by providing prior written notice to the other.

3.5    Payments. Borrower hereby authorizes and requests Bank to use line of credit funds to pay line of credit fees owing to Bank, interest on the line of credit, legal fees and expenses of Bank's attorneys which are payable by Borrower, and such other sums as may be owing from time to time by notice to or authorization by Borrower. Bank at its option may make any such payment on Borrower's behalf by debiting the line of credit itself. Alternatively, Bank may disburse all or part of the payment amount into the Account, and then may either debit the Account or invoice Borrower in the amount of the payment. In the event such disbursement under the line of credit causes the total amount of credit outstanding under the line to exceed the limitations set forth in this Agreement, Borrower will immediately pay the excess to Bank upon Bank's demand.

3.6    Business Days. A Business Day is defined in the Note. All payments and disbursements which would be due on a day which is not a Business Day will be due on the next Business Day. All payments received on a day which is not a Business Day will be applied to the line of credit on the next Business Day.

4.    CONDITIONS

Bank must receive the following items, in form and content acceptable to Bank, before it is required to extend any credit to the Borrowers under this Agreement:

4.1    Authorizations. Evidence that the execution, delivery and performance by Borrowers of the Loan Documents have been duly authorized, including without limitation, the certificate of the Secretary of the Corporate Borrower described in Section 1.4(c) hereof.

4.2    Governing Documents; Good Standing Certificates. A copy of the Corporate Borrower's articles of incorporation and bylaws and a currently dated certificate of good standing for the Corporate Borrower from the state where formed and from any other state in which the Corporate Borrower is required to qualify to conduct its business.

4.3    Loan Documents. Duly executed Loan Documents.

4.4    Other Required Documentation: The Bank shall also have received the following, all of which are subject to being satisfactory to the Bank in its sole judgment and discretion: (a) Current financial statements of the Borrower, including detailed balance sheet, income statement, real estate property schedule, cash flow statement and contingent liability schedule; (b) copies of the Borrowers' most recent Federal income tax returns; and (c) Evidence satisfactory to the Bank that the liquidity of the Borrowers is not less than $1,500,000.

4.5    Insurance. Evidence of insurance coverage required by the Loan Documents.

4

4.6     Legal Opinion.  A written opinion from the Corporate Borrower's legal counsel covering such matters as Bank may require.  The legal counsel and the content of the opinion must be acceptable to Bank.

4.7     Payment of Fees.  Payment of all accrued and unpaid expenses incurred by Bank as provided for by the Loan Documents.

4.8     Other Items.  Any other documents and other items Bank may reasonably require as conditions precedent to this Agreement.

5.     REPRESENTATIONS AND WARRANTIES

When the Borrowers sign this Agreement, and until Bank is repaid in full, the Borrowers make the following representations and warranties.  Each request for an extension of credit constitutes a renewed representation and warranty.

5.1     Organization of Corporate Borrower; Good Standing.  The Corporate Borrower is duly formed and existing under the laws of the state where organized.  In each state in which the Corporate Borrower does business, it is properly licensed, in good standing, and, where required, in compliance with any fictitious name statute.

5.2     Authorization; Enforceable Agreement.  This Agreement and the other Loan Documents are within the Corporate Borrower's powers, have been duly authorized, and do not conflict with any of its organizational documents.  The Loan Documents do not conflict with any law, agreement, or obligation by which any of the Borrowers is bound.  This Agreement is a legal, valid and binding agreement of Borrowers, enforceable against Borrowers in accordance with its terms, and any instrument or document required hereunder, when executed and delivered, will be similarly legal, valid, binding and enforceable.

5.3     Financial Information.  All financial and other information that has been or will be supplied to Bank, including the financial statements and balance sheet of each Borrower:

(a)     Is sufficiently complete to give Bank accurate knowledge of the subject's financial condition, including all material contingent liabilities;

(b)     Is in form and content as required by Bank;

(c)     Is in compliance with any government regulations that apply; and

(d)     Does not fail to state any material facts necessary to make the information contained therein not misleading.

All such information was and will be prepared in accordance with generally accepted accounting principles consistently applied, unless otherwise noted.  Since the dates of the financial information specified above, there has been no material adverse change in the business condition

5

(financial or otherwise), operations, properties or prospects of any of the Borrowers or any other subject thereof.

5.4    Lawsuits.    There is no lawsuit, arbitration, claim or other dispute pending or threatened against any of the Borrowers which, if lost, would impair such Borrower's financial condition or ability to repay the line of credit, except as has been previously disclosed in writing to Bank.

5.5    Title to Assets.  Each Borrower has good and clear title to its assets, and the same are not subject to any mortgages, deeds of trust, pledges, security interests or other encumbrances other than those permitted by Bank in writing.

5.6    Permits, Franchises. Each Borrower possesses all permits, franchises, contracts and licenses required and all trademark rights, trade name rights, and fictitious name rights necessary to enable it to conduct the business in which it is now engaged.

5.7    Income Tax Returns. Each Borrower has filed all tax returns and reports required to be filed and has paid all applicable federal, state and local franchise, income and property taxes which are due and payable. No Borrower has knowledge of any pending assessments or adjustments of its income taxes or property taxes for any year, except as have been disclosed in writing to Bank.  No Borrower is a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended.

5.8    Other Obligations.  None of the Borrowers is in default on any obligation for borrowed money, any purchase money obligation or any other material lease, commitment, contract, instrument or obligation, except as has been previously disclosed in writing to Bank.

5.9    No Event of Default.  There is no event which is, or with notice or lapse of time or both would be, a default under the Loan Documents.

5.10    Location of Borrowers. Each Borrower's place of business (or, if Borrower has more than one place of business, its chief executive office) is located at the address listed under Borrower's signature on this Agreement.

6.    COVENANTS

The Borrowers agree, so long as credit is available under this Agreement and until Bank is repaid in full:

6.1    Use of Proceeds. To use the proceeds of the line of credit for short-term loans for real estate purposes provided that the aggregate principal amount of the loans at any time outstanding shall not exceed $2,000,000.00.

6.2    Financial Information.  To provide the following financial information and statements and such additional information as requested by Bank from time to time:

6

(a)     As soon as available but not later than one hundred twenty (120) days after each Borrower's fiscal year-end, each Borrower's annual financial statements, including detailed balance sheet, income statement, real estate property schedule, cash flow statement and contingent liability schedule. These financial statements must be satisfactory to the Bank and must be prepared in the same form as the Borrowers' financial statements that were previously provided to the Bank.

(b)     With respect to the Corporate Borrower, promptly, upon sending or receipt, copies of any management letters and correspondence relating to management letters, sent or received by Borrower to or from Borrower's auditor, or, if no management letter is prepared, a letter from such auditor stating that no deficiencies were noted that would otherwise be addressed in a management letter.

(c)     Copies of Borrower's federal income tax returns (with all forms attached), within sixty (60) days of filing, together with a statement of any contributions made or distributions received by each Borrower to or from any partnership, subchapter S corporation or trust, and, if requested by Bank, copies of any extensions of the filing date.

(d)     Within thirty (30) days after each calendar quarter-end, a compliance certificate of Borrower signed by each individual Borrower, and by an authorized financial officer of the Corporate Borrower setting forth (i) the information and computations (in sufficient detail) to establish that Borrower is in compliance with all financial covenants at the end of the applicable period and (ii) whether there existed as of the date of the Borrowers' most recent financial statements and whether there exists as of the date of the certificate, any Event of Default under this Agreement and, if any such Event of Default exists, specifying the nature thereof and the action Borrower is taking and proposes to take with respect thereto.

6.3     Other Information. To provide Bank:

(a)     Promptly after the same are sent or released, copies of all reports, proxy statements and financial statements which the Corporate Borrower sends to its shareholders, and copies of all press releases made by any of the Borrowers, and, promptly after the same are filed, copies of all financial statements and regular, periodic or special reports which any of the Borrowers may make to or file with any governmental authority.

(b)     Promptly after the same are received, copies of all reports which the independent certified public accountants of any Borrower deliver to it.

(c)     Such additional financial and other information as Bank may reasonably request from time to time.

6.4     Liquidity. To maintain at all times unencumbered liquid assets equal to at least One Million Five Hundred Thousand Dollars ($1,500,000.00).

7

"Liquid assets" means the following assets of Borrowers:

    (i)    Cash;

    (ii)    Certificates of deposit or time deposits with terms of six (6) months or less;

    (iii)    A-1/P-1 commercial paper with a term of three (3) months or less;

    (iv)    U.S. treasury bills and other obligations of the federal government, all with terms of six (6) months or less;

    (v)    Readily marketable securities (excluding "margin stock" (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System), restricted stock and stock subject to the provisions of Rule 144 of the Securities and Exchange Commission) rated at least "A" by Standard & Poor's Ratings Group or at least "A" by Moody's Investors Service, Inc.;

    (vi)    Bankers' acceptances issued for terms of six (6) months or less by financial institutions rated at least "A-1" by Standard & Poor's Ratings Group, or "P-1" by Moody's Investors Service, Inc.;

    (vii)    Repurchase agreements with terms of six (6) months or less covering U.S. government securities.

Within thirty (30) days of each calendar quarter-end, each Borrower shall provide the Bank copies of statements from depository institutions or brokerage firms, or other evidence acceptable to Bank of each Borrower's liquid assets.

    6.5    Taxes and Other Liabilities. To pay and discharge, before the same become delinquent and before penalties accrue thereon, all taxes, assessments and governmental charges upon or against the Borrowers or any of their properties, and all its other liabilities at any time existing, except to the extent and so long as:

    (a)    The same are being contested in good faith and by appropriate proceedings in such manner as not to cause any materially adverse effect to a Borrower's financial condition or the loss of any right of redemption from any sale thereunder; and

    (b)    If applicable to the Corporate Borrower, the Corporate Borrower shall have set aside on its books reserves (segregated to the extent required by generally accepted accounting principles) adequate with respect thereto.

    6.6    Trusts. Not to transfer any of assets of any Borrower to a trust unless the trust is acceptable to Bank in form and content, and the trustee guaranties payment of Borrower's obligations under this Agreement prior to any such transfer.

6.7    Intentionally Omitted.

6.8    Liens. Not to create, assume, or allow any security interest or lien (including judicial liens) on property that any Borrower now or later owns, except:

(a)    Deeds of trust and security agreements in favor of Bank;

(b)    Liens for property taxes not yet due;

(c)    Liens outstanding on the date of this Agreement and previously disclosed in writing to and permitted by Bank;

(d)    With respect to any Borrower other than the corporate Borrower, additional purchase money security interests in personal or real property acquired after the date of this Agreement for consumer purposes, if the total principal amount of debts secured by such liens does not exceed Five Million Dollars ($5,000,000.00) at any one time; and

(e)    Additional liens against personal assets of Borrower which secure consumer purpose indebtedness permitted hereunder.

6.9    Loans to Officers or Relatives. As to the Corporate Borrower, not to make any loans, advances or other extensions of credit to any of the Corporate Borrower's executives, officers, directors, shareholders (or any relatives of any of the foregoing).

6.10    Change of Ownership. Not to cause, permit, or suffer any change, direct or indirect, in the Corporate Borrower's capital ownership.

6.11    Notices to Bank. To promptly notify Bank in writing of:

(a)    Any Event of Default hereunder or any event which would become an Event of Default hereunder upon the giving of notice, the lapse of time, or both;

(b)    Any lawsuit or arbitration over Fifty Thousand Dollars ($50,000) against any of the Borrowers;

(c)    Any significant dispute between a Borrower and any government authority;

(d)    Any failure to comply with this Agreement;

(e)    Any material adverse change in any Borrower's business condition (financial or otherwise), operations, properties or prospects, or ability to repay the line of credit; and

9

(f)    Any change in any Borrower's name or address, or with respect to the Corporate Borrower, it's name or trade name, legal structure, or place of business (or chief executive office if Borrower has more than one place of business).

6.12    Audits; Books and Records.    To maintain adequate books and records and to allow Bank and its agents to inspect the Borrowers' properties and examine, audit and make copies of books and records at any reasonable time.  If any of Borrowers' properties, books or records are in the possession of a third party, any such Borrower hereby authorizes that third party to permit Bank or its agents to have access to perform inspections or audits and to respond to Bank's requests for information concerning such properties, books and records.  Bank has no duty to inspect any Borrower's properties or to examine, audit, or copy books and records and Bank shall not incur any obligation or liability by reason of not making any such inspection or inquiry.  In the event that Bank inspects any Borrower's properties or examines, audits, or copies books and records, Bank will be acting solely for the purposes of protecting Bank's security and preserving Bank's rights under this Agreement.  Neither the Borrowers nor any other party is entitled to rely on any inspection or other inquiry by Bank.  Bank owes no duty of care to protect Borrowers or any other party against, or to inform Borrowers or any other party of, any adverse condition that may be observed as affecting Borrowers' properties or premises, or Borrowers' business.  Bank may in its discretion disclose to Borrowers or any other party any findings made as a result of, or in connection with, any inspection of Borrowers' properties.

6.13    Compliance with Laws.    To comply with the laws (including any fictitious name statute), regulations, and orders of any government body with authority over the business of each of the Borrowers.

6.14    Preservation of Rights.    To maintain and preserve all rights, privileges, and franchises each Borrower now has.

6.15    Maintenance of Properties.    To make repairs, renewals, or replacements to keep each Borrower's properties in good working condition.

6.16    Intentionally Omitted.

6.17    ERISA and Prohibited Transactions.    To comply with the following representations, warranties and covenants, as of the date hereof and throughout the term of the line of credit: (a) Borrowers are not and will not be (i) an "employee benefit plan," as defined in Section 3(3) of ERISA, (ii) a "governmental plan" within the meaning of Section 3(32) of ERISA, or (iii) a "plan" within the meaning of Section 4975(e) of the Code; (b) the assets of Borrowers do not and will not constitute "plan assets" within the meaning of the United States Department of Labor Regulations set forth in Section 2510.3-101 of Title 29 of the Code of Federal Regulations; (c) transactions by or with Borrowers are not and will not be subject to state statutes applicable to Borrowers regulating investments of fiduciaries with respect to governmental plans; and (d) Borrowers will not engage in any transaction that would cause any obligation or any action taken or to be taken hereunder (or the exercise by Bank of any of its rights under this Agreement or any of the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA or Section 4975

10

of the Code. Borrowers agree to deliver to Bank such certifications or other evidence of compliance with the provisions of this Section as Bank may from time to time request. As used herein, "Code" means the Internal Revenue Code of 1986, as amended from time to time, and "ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

6.18    Additional Negative Covenants. Not to take any of the following actions, without Bank's written consent:

(a)    Engage in any business activities substantially different from Borrowers' present business;

(b)    Liquidate or dissolve any business of the Borrowers;

(c)    Intentionally Omitted.

(d)    Sell, assign, lease, transfer or otherwise dispose of all or a substantial part of any of Borrowers' businesses or Borrowers' assets except in the ordinary course of business;

(e)    Intentionally Omitted.

(f)    Sell, assign, lease, transfer or otherwise dispose of any assets for less than fair market value or enter into any agreement to do so or any sale and leaseback agreement covering any of its fixed or capital assets;

(g)    Voluntarily suspend its business activity for more than two days; or

(h)    Use any proceeds of the line of credit, directly or indirectly, to purchase or carry, or reduce or retire any loan incurred to purchase or carry any "margin stock" (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System) or to extend credit to others for the purpose of purchasing or carrying any margin stock.

6.19    No Consumer Purpose. Not to use this line of credit for personal, family, or household purposes. Bank may provide Borrowers with certain disclosures intended for loans made for personal, family, or household purposes. The fact that Bank elects to make such disclosures shall not be deemed a determination by Bank that this line of credit will be used for such purposes.

6.20    Cooperation. To take any action reasonably requested by Bank to carry out the intent of the Loan Documents.

7.    NO COLLATERAL. This line of credit is unsecured.

11

8.    DEFAULT

If any of the following events occurs (an "Event of Default"), Bank may declare Borrowers in default, stop making any additional credit available to Borrower, and require Borrower to repay its entire debt immediately and without prior notice. However, if a bankruptcy petition is filed with respect to any of the Borrowers, the entire debt outstanding under this Agreement shall automatically be due immediately.

8.1    Event of Default under Note. If an Event of Default shall have occurred under the terms of, and as defined in, the Note.

8.2    False Information. Any Borrower has given Bank false or misleading information or representations.

8.3    Death; Change of Management. Death, dissolution, termination or liquidation of any Borrower, or the Corporate Borrower's chief executive officer ceases for any reason to act in said capacity; and said person is not replaced within thirty (30) days of such death or change by someone satisfactory to Bank as being a comparable substitute.

8.4    Bankruptcy. Any Borrower files a bankruptcy petition or makes a general assignment for the benefit of creditors, or a bankruptcy petition is filed against any Borrower. The default will be deemed cured if any bankruptcy petition filed against any Borrower is dismissed within a period of forty-five (45) days after the filing; provided, however, that Bank will not be obligated to extend any additional credit to any of the Borrowers during that period.

8.5    Receivers. A receiver or similar official is appointed for any of the Borrowers' businesses (or the majority shareholder of the Corporate Borrower), or any such business is terminated.

8.6    Intentionally Omitted.

8.7    Intentionally Omitted.

8.8    Government Action. Any government authority takes action that Bank believes materially adversely affects any of the Borrowers' financial condition or ability to repay the line of credit.

8.9    Material Adverse Change. A material adverse change occurs, in any of the Borrowers' business condition (financial or otherwise), operations, properties or prospects, or ability to repay the line of credit.

8.10    Default Under Related Documents. Any guaranty, or other document required by this Agreement is breached, violated or is no longer in effect.

8.11    Other Breach Under This Agreement. Any of the Borrowers fail to meet the conditions of or fail to perform any obligation under any term of this Agreement not specifically

referred to in this Article. If, in Bank's opinion, the breach is capable of being remedied, the breach will not be considered an Event of Default under this Agreement for a period of thirty (30) days after the date on which Bank gives written notice of the breach to Borrowers; provided, however, that Bank will not be obligated to extend any additional credit to Borrowers during that period.

8.12    Cross-Default. Any default occurs under any agreement in connection with any credit Borrowers or any of Borrowers' related entities or affiliates has obtained from Bank.

8.13    Revocation or Termination. If any of the Borrowers is comprised of the trustee(s) of a trust, the trust is revoked or otherwise terminated or all or a substantial part of any Borrower's assets are distributed or otherwise disposed of.

## 9.    ENFORCING THIS AGREEMENT; MISCELLANEOUS

9.1    Remedies. If an Event of Default occurs under the Loan Documents, Bank may exercise any right or remedy which it has under any of the Loan Documents or which is otherwise available at law or in equity. All of Bank's rights and remedies shall be cumulative. At Bank's option, exercisable in its sole discretion, all of Borrowers' obligations under the Loan Documents will become immediately due and payable without notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor, or other notices or demands of any kind.

9.2    Governing Law. This Agreement shall be governed by, and construed under, the laws of the State of New Jersey.

9.3    Dispute Resolution.

(a)    Definitions. As used herein, the following terms shall have the meanings specified below:

"AAA" means the American Arbitration Association, or any successor thereof.

"Dispute" means any controversy, claim or dispute between or among the parties to this Agreement, including any such controversy, claim or dispute arising out of or relating to (i) this Agreement, (ii) any other Loan Document, (iii) any related agreements or instruments, or (iv) the transaction contemplated herein or therein (including any claim based on or arising from an alleged personal injury or business tort).

(b)    Arbitration. Except to the extent expressly provided below, any Dispute shall, upon the request of either party, be determined by binding arbitration in accordance with the Federal Arbitration Act, Title 9, United States Code (or if not applicable, the applicable state law), the then-current rules for arbitration of financial services disputes of AAA and the "Special Rules" set forth below. In the event of any inconsistency, the Special Rules shall control. The filing of a court action is not intended to constitute a waiver of the right of Borrowers or Bank,

13

including the suing party, thereafter to require submittal of the Dispute to arbitration. Any party to this Agreement may bring an action, including a summary or expedited proceeding, to compel arbitration of any Dispute in any court having jurisdiction over such action. For the purposes of this Dispute Resolution Section only, the terms "party" and "parties" shall include any parent corporation, subsidiary or affiliate of Bank involved in the servicing, management or administration of any obligation described in or evidenced by this Agreement, together with the officers, employees, successors and assigns of each of the foregoing.

(c)    Special Rules.

(i)    The arbitration shall be conducted in any U.S. state where real or tangible personal property collateral is located, or if there is no such collateral, in the City and County where Bank is located pursuant to its address for notice purposes in this Agreement.

(ii)    The arbitration shall be administered by AAA, who will appoint an arbitrator. If AAA is unwilling or unable to administer or legally precluded from administering the arbitration, or if AAA is unwilling or unable to enforce or legally precluded from enforcing any and all provisions of this Dispute Resolution Section, then any party to this Agreement may substitute, without the necessity of the agreement or consent of the other party or parties, another arbitration organization that has similar procedures to AAA but that will observe and enforce any and all provisions of this Dispute Resolution Section. All Disputes shall be determined by one arbitrator; however, if the amount in controversy in a Dispute exceeds Five Million Dollars ($5,000,000), upon the request of any party, the Dispute shall be decided by three arbitrators (for purposes of this Agreement, referred to collectively as the "arbitrator").

(iii)    All arbitration hearings will be commenced within ninety (90) days of the demand for arbitration and completed within ninety (90) days from the date of commencement; provided, however, that upon a showing of good cause, the arbitrator shall be permitted to extend the commencement of such hearing for up to an additional sixty (60) days.

(iv)    The judgment and the award, if any, of the arbitrator shall be issued within thirty (30) days of the close of the hearing. The arbitrator shall provide a concise written statement setting forth the reasons for the judgment and for the award, if any. The arbitration award, if any, may be submitted to any court having jurisdiction to be confirmed and enforced, and such confirmation and enforcement shall not be subject to arbitration.

(v)    The arbitrator will give effect to statutes of limitation and any waivers thereof in determining the disposition of any Dispute and may dismiss one or more claims in the arbitration on the basis that such claim or claims is or are barred. For purposes of the application of the statute of limitations, the service on AAA under applicable AAA rules of a notice of Dispute is the equivalent of the filing of a lawsuit.

(vi)    Any dispute concerning this Dispute Resolution Section, including any such dispute as to the validity or enforceability hereof or whether a Dispute is arbitrable, shall be determined by the arbitrator; provided, however, that the arbitrator shall not be permitted to vary the express provisions of these "Special Rules" or the "Reservations of Rights" in subsection (d) below.

(vii)   The arbitrator shall have the power to award legal fees and costs pursuant to the terms of this Agreement.

(viii)  The arbitration will take place on an individual basis without reference to, resort to, or consideration of any form of class or class action.

(d)     Reservations of Rights. Nothing in this Agreement shall be deemed to (i) limit the applicability of any otherwise applicable statutes of limitation and any waivers contained in this Agreement, or (ii) apply to or limit the right of Bank (A) to exercise self help remedies such as (but not limited to) setoff, or (B) to foreclose judicially or nonjudicially against any real or personal property collateral, or to exercise judicial or nonjudicial power of sale rights, (C) to obtain from a court provisional or ancillary remedies such as (but not limited to) injunctive relief, writ of possession, prejudgment attachment, or the appointment of a receiver, or (D) to pursue rights against a party to this Agreement in a third-party proceeding in any action brought against Bank in a state, federal or international court, tribunal or hearing body (including actions in specialty courts, such as bankruptcy and patent courts). Bank may exercise the rights set forth in clauses (A) through (D), inclusive, before, during or after the pendency of any arbitration proceeding brought pursuant to this Agreement. Neither the exercise of self help remedies nor the institution or maintenance of an action for foreclosure or provisional or ancillary remedies shall constitute a waiver of the right of any party, including the claimant in any such action, to arbitrate the merits of the Dispute occasioning resort to such remedies. No provision in the Loan Documents regarding submission to jurisdiction and/or venue in any court is intended or shall be construed to be in derogation of the provisions in any Loan Document for arbitration of any Dispute.

(e)     Conflicting Provisions for Dispute Resolution. If there is any conflict between the terms, conditions and provisions of this Section and those of any other provision or agreement for arbitration or other dispute resolution, the terms, conditions and provisions of this Section shall prevail as to any Dispute arising out of or relating to (i) this Agreement, (ii) any other Loan Document, (iii) any related agreements or instruments, or (iv) the transaction contemplated herein or therein (including any claim based on or arising from an alleged personal injury or business tort). In any other situation, if the resolution of a given Dispute is specifically governed by another provision or agreement for arbitration or other dispute resolution, the other provision or agreement shall prevail with respect to said Dispute.

(f)     Jury Trial Waiver in Arbitration. By agreeing to this Section, the parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect of any Dispute.

15

9.4    WAIVER OF JURY TRIAL. WITHOUT INTENDING IN ANY WAY TO LIMIT THE PARTIES' AGREEMENT TO ARBITRATE ANY "DISPUTE" (FOR PURPOSES OF THIS SECTION, AS DEFINED IN SECTION 9.3) AS SET FORTH IN THIS AGREEMENT, TO THE EXTENT ANY "DISPUTE" IS NOT SUBMITTED TO ARBITRATION OR IS DEEMED BY THE ARBITRATOR OR BY ANY COURT WITH JURISDICTION TO BE NOT ARBITRABLE OR NOT REQUIRED TO BE ARBITRATED, BORROWERS AND BANK WAIVE TRIAL BY JURY IN RESPECT OF ANY SUCH "DISPUTE" AND ANY ACTION ON SUCH "DISPUTE." THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY BORROWERS AND BANK, AND BORROWERS AND BANK HEREBY REPRESENT THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY PERSON OR ENTITY TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.    THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THE LOAN DOCUMENTS. BORROWERS AND BANK ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER OF JURY TRIAL. BORROWERS FURTHER REPRESENT AND WARRANT THAT THEY HAVE BEEN REPRESENTED IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, OR HAVE HAD THE OPPORTUNITY TO BE REPRESENTED BY INDEPENDENT LEGAL COUNSEL SELECTED OF THEIR OWN FREE WILL, AND THAT THEY HAVE HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.

9.5    Presentment, Demands and Notice. Bank shall be under no duty or obligation to make or give any presentment, demands for performances, notices of nonperformance, protests, notices of protest or notices of dishonor in connection with any obligation or indebtedness under the Loan Documents.

9.6    Indemnification. Borrowers shall indemnify, save, and hold harmless Bank and its parent and affiliates and all of their directors, officers, employees, agents, successors, attorneys and assigns (collectively, the "Indemnitees") for, from and against the following matters (collectively, the "Indemnified Matters"):

(a)    Any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, charges, expenses and disbursements (including attorneys' fees, including the reasonable estimate of the allocated cost of in-house counsel and staff) of any kind with respect to the execution, delivery, enforcement, performance and administration of this Agreement and the other Loan Documents, and the transactions contemplated hereby, and with respect to any investigation, litigation or proceeding related to this Agreement, the other Loan Documents, the line of credit or the use of the proceeds thereof, whether or not any Indemnitee is a party thereto.

(b)    Any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, charges, expenses and disbursements (including attorneys' fees, including the reasonable estimate of the allocated cost of in-house counsel and staff) directly or

16

indirectly arising out of the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence of a "Hazardous Substance." As used herein, "Hazardous Substance" means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," "contaminant" or a similar designation or regulation under any federal, state or local law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such law, including without limitation petroleum or natural gas. This indemnity will apply whether the Hazardous Substance is on, under or about Borrowers' property or operations or property leased to Borrowers.

(c)    Any and all writs, subpoenas, claims, demands, actions, or causes of action that are served on or asserted against any Indemnitee (if directly or indirectly related to a writ, subpoena, claim, demand, action, or cause of action against Borrowers or any affiliate of any of the Borrowers); and any and all liabilities, losses, costs, or expenses (including attorneys' fees, including the reasonable estimate of the allocated cost of in-house counsel and staff) that any Indemnitee suffers or incurs as a result of any of such Indemnified Matters.

The obligations of Borrowers under this Section shall survive payment of the line of credit and assignment of any rights hereunder. The foregoing notwithstanding, Borrowers shall have no obligation hereunder to any Indemnitee with respect to Indemnified Matters arising from the gross negligence or willful misconduct of such Indemnitee.

9.7    Attorneys' Fees. In the event of a lawsuit, reference or arbitration proceeding, including any tort proceeding, between or among the parties hereto, the prevailing party is entitled to recover costs and reasonable attorneys' fees (including any allocated costs of in-house counsel) incurred in connection with the lawsuit, reference or arbitration proceeding, as determined by the court, referee or arbitrator.

9.8    Notices. All notices required under this Agreement shall be personally delivered or sent by registered or certified mail, postage prepaid, or facsimile transmission to the addresses on the signature page of this Agreement, or to such other addresses as Bank and Borrowers may specify from time to time in writing. Notices shall be effective upon receipt or when proper delivery is refused.

9.9    Multiple Borrowers. If the Borrowers consist of more than one person or entity each will be individually obligated to repay Bank in full, and all will be obligated together.

9.10    Successors and Assigns. This Agreement is binding on Borrowers' and Bank's successors and assignees. Borrowers agree that they may not assign this Agreement or the other Loan Documents without Bank's prior consent. Bank may sell participations in or assign this line of credit, and may provide financial information about Borrowers to actual or potential participants or assignees, without notice to or consent of Borrowers.

9.11    No Third Parties Benefited. This Agreement is made and entered into for the sole protection and benefit of Bank and Borrowers and their successors and assigns. No trust fund is created by this Agreement and no other persons or entities shall have any right of action under this Agreement or any right to the line of credit funds.

17

9.12    Integration; Relation to Any Loan Commitment; Headings. The Loan Documents (a) integrate all the terms and conditions in or incidental to this Agreement, (b) supersede all oral negotiations and prior writings with respect to their subject matter, including any loan commitment to Borrowers, and (c) are intended by the parties as the final expression of the agreement with respect to the terms and conditions set forth in those documents and as the complete and exclusive statement of the terms agreed to by the parties. No representation, understanding, promise or condition shall be enforceable against any party unless it is contained in the Loan Documents. If there is any conflict between the terms, conditions and provisions of this Agreement and those of any other agreement or instrument, including any other Loan Document, the terms, conditions and provisions of this Agreement shall prevail. Headings and captions are for reference only and shall not affect the interpretation or meaning of any provisions of this Agreement. The exhibits to this Agreement are hereby incorporated in this Agreement.

9.13    Interpretation. Time is of the essence in the performance of this Agreement by Borrowers. The word "include(s)" means "include(s), without limitation," and the word "including" means "including but not limited to." No listing of specific instances, items or matters in any way limits the scope or generality of any language of this Agreement.

9.14    Severability; Waivers; Amendments. This Agreement may not be modified or amended except by a written agreement signed by the parties. Any consent or waiver under this Agreement must be in writing. If any part of this Agreement is not enforceable, the rest of the Agreement may be enforced. If Bank waives a default, it may enforce a later default. No waiver shall be construed as a continuing waiver. No waiver shall be implied from Bank's delay in exercising or failure to exercise any right or remedy against Borrowers. Consent by Bank to any act or omission by Borrowers shall not be construed as a consent to any other or subsequent act or omission or as a waiver of the requirement for Bank's consent to be obtained in any future or other instance. Bank retains all of its rights and remedies, even if it makes an advance after a default.

9.15    Counterparts. This Agreement may be executed in counterparts each of which, when executed, shall be deemed an original, and all such counterparts shall constitute one and the same agreement.

**[Signature Page Follows]**

18

This Agreement is executed as of the date stated at the top of the first page.

**BANK OF AMERICA, N.A.,**
a national banking association

By: _____
    Douglas R. Doerr, Senior Vice President

**JARMISON GROUP, INC.,**
a New Jersey corporation

By: _____
    Norma O. Teicher, President

_____
**FRED TEICHER**, Individually

_____
**NORMA O. TEICHER**, Individually

_____
**STUART TEICHER**, Individually

_____
**JEREMY TEICHER**, Individually

_____
**RYAN TEICHER**, Individually

Address where notices to
Bank are to be sent:

The Bank of America, N.A.
750 Walnut Avenue
Cranford, New Jersey 07016
Attention: Douglas R. Doerr,
          Senior Vice President

Address where notices to
Borrowers are to be sent:

Jarmison Group, Inc.
758 State Highway 18, Suite 103
East Brunswick, NJ 08816
Attention: Stuart I. Teicher, Sr.,
          VP & General Counsel

19

This Agreement is executed as of the date stated at the top of the first page.

**BANK OF AMERICA, N.A.,**
a national banking association

By: _____
Douglas R. Doerr, Senior Vice President

**JARMISON GROUP, INC.,**
a New Jersey corporation

By: _____
Norma O. Teicher, President

_____
**FRED TEICHER**, Individually

_____
**NORMA O. TEICHER**, Individually

_____
**STUART TEICHER**, Individually

_____
**JEREMY TEICHER**, Individually

_____
**RYAN TEICHER**, Individually

Address where notices to
Bank are to be sent:

The Bank of America, N.A.
750 Walnut Avenue
Cranford, New Jersey 07016
Attention:  Douglas R. Doerr,
            Senior Vice President

Address where notices to
Borrowers are to be sent:

Jarmison Group, Inc.
758 State Highway 18, Suite 103
East Brunswick, NJ 08816
Attention:  Stuart I. Teicher, Sr.,
            VP & General Counsel

19

Borrowers' Addresses (Section 5.10):

Jarmison Group, Inc.
758 Highway 18, Suite 103
East Brunswick, NJ 08816

Mr. Fred Teicher
25 Rath Lane
East Brunswick, NJ 08816

Ms. Norma O. Teicher
25 Rath Lane
East Brunswick, NJ 08816

Mr. Stuart Teicher
2 Winchester Drive
East Brunswick, NJ 08816

Mr. Jeremy Teicher
205 West End Avenue, Apt. 29H
New York, NY 10023

Mr. Ryan Teicher
303 West 66th Street, Apt. 4AW
New York, NY 10023

EXHIBIT A
BORROWING NOTICE

Date of this Notice: _____ , 200_

Bank of America, N.A.
Home Builder Division
750 Walnut Avenue
Cranford, NJ 07016

Attention:  Douglas R. Doerr, Senior Vice President

Re:    Line of Credit Loan Agreement dated as of July __, 2006 (the "Loan Agreement")
       between Bank of America, N.A. ("Bank") and **Fred Teicher, Norma O. Teicher, Stuart
       Teicher, Jeremy Teicher, Ryan Teicher, and Jarmison Group, Inc.** (collectively, the
       "Borrowers")

Dear Ladies and Gentlemen:

       Reference is made to the Loan Agreement.  Capitalized terms used in this Borrowing
Notice without definition have the meanings specified in the Loan Agreement.

       Pursuant to the Loan Agreement, notice is hereby given that Borrowers desire that Bank
make the advance described in attached Schedule 1 (the "Advance").  Borrowers and the
undersigned Officer of the Corporate Borrower hereby certify that:

       1.      Commitment.  The outstanding amount of the line of credit shall not, after giving
effect to the making of the Advance, exceed the Commitment;

       2.      Representations and Warranties.  All representations and warranties of Borrowers
contained in the Loan Agreement and the other Loan Documents are true and correct as of the
date hereof and shall be true and correct on the date of the Advance, both before and after giving
effect to the Advance; provided, however, that the representations and warranties of Borrowers
set forth in the Loan Agreement regarding financial statements shall be deemed to be made with
respect to the financial statements most recently delivered to Bank pursuant to the Loan
Agreement;

       3.      No Event of Default.  No Event of Default exists as of the date hereof or will
result from the making of the Advance or would result after notice or passage of time;

       4.      Use of Proceeds.  The proceeds of the Advance will be used only as permitted by
the Loan Agreement;

       5.      No Material Adverse Effect.  Since the date of the Loan Agreement, there has
been no act, omission, change or event which has a material adverse effect in Borrowers'

- 1 -

business condition (financial or otherwise), operations, properties or prospects, or ability to repay the line of credit.

6.    Other Conditions. Enclosed are the documents and information requested by Bank as a condition to this Advance.

Very truly yours,

Jarmison Group, Inc.
a New Jersey corporation

By: _____
     Norma O. Teicher, President

[and]

_____
Fred Teicher

[and/or]

_____
Norma O. Teicher

**Schedule 1**
**to Borrowing Notice**

REQUESTED LOAN

1.   Amount of Requested Advance: $_____
     (Must be in minimum amount(s) required by Loan Agreement)

2.   Maturity Date of Advance: _____
     (Must be one year after date of Advance)

3.   Purpose of Advance: _____

4.   Identify Source of Repayment of Advance: _____

- 3 -

BANK OF AMERICA, N.A.
750 Walnut Avenue
Cranford, New Jersey 07016

November 30, 2007

Fred Teicher
Norma O. Teicher
Stuart Teicher
Jeremy Teicher
Ryan Teicher
Jarmison Group, Inc.
785 State Highway 18, Suite 103
East Brunswick, New Jersey 08816

RE:    Bank of America, N.A. (the "Bank") to Fred Teicher, Norma Teicher, Stuart Teicher, Jeremy Teicher, Ryan Teicher and Jarmison Group, Inc. (collectively, the "Borrower")

Ladies and Gentlemen:

Reference is made to that certain $2,000,000.00 Promissory Note dated July 20, 2006 from the Borrower to the Bank (the "Note"). Reference is made to that certain Line of Credit Loan Agreement dated July 20, 2006 between the Bank and the Borrower (the "Loan Agreement"). Borrower and the Bank hereby acknowledge that (i) Teicher Organization at Pinecrest, LLC has granted a mortgage in favor or the Bank as security for the Note (the "Pinecrest Mortgage"), and (ii) Teicher Organization at the Commons at Saugerties, LLC has granted a mortgage in favor of the Bank as security for the Note (the "Saugerties Mortgage"). The Borrower and the Bank hereby agree to modify the Loan Agreement as follows:

1.    The "Expiration Date" as defined in the Loan Agreement is hereby amended to be "July 20, 2008."

2.    The following subsection 8.14 is hereby added to the Loan Agreement as an Event of Default.

"8.14 "Mortgages. If an Event of Default shall occur under the Pinecrest Mortgage or the Saugerties Mortgage."

The Borrower shall pay the Bank's modification fee of $10,000.00 and the Bank's attorney's fees in connection with this letter Agreement, the Pinecrest Mortgage and the Saugerties Mortgage.

The modification set forth herein is limited precisely as written and shall not be deemed (a) to be a modification, consent to or waiver of any other term or condition of the Note or Loan Agreement, or (b) prejudice any right or rights which the Bank may have or may have in

modification_note_amend ltr 11_27_07

the future under or in connection with the Note or Loan Agreement. All other terms and conditions of the Note and Loan Agreement remain unchanged and in full force and effect. Borrower confirms that they have no offsets, defenses or counterclaims to the Note or Loan Agreement.

This letter Agreement may be executed in counterparts each of which, when executed, shall be deemed an original, and all such counterparts shall constitute one and the same agreement.

Very truly yours,

**BANK OF AMERICA, N.A.**

By:_____

Douglas Doerr, Vice President

**AGREED TO AND ACCEPTED BY**
**ON THIS 28ᵗʰ DAY OF NOVEMBER, 2007:**

JARMISON GROUP, INC.

By: _____ President

Name: NIRMA O. TEICHER

Title: PRESIDENT

_____

FRED TEICHER

_____

NORMA O. TEICHER

_____

STUART TEICHER

_____

JEREMY TEICHER

_____

RYAN TEICHER

2

**STATE OF NEW JERSEY :**

ss.

**COUNTY OF MIDDLESEX:**

On the 28ᵗʰ day of November, in the year 2007, before me, the undersigned, personally appeared Norma O. Teicher, President, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Notary Public

OKSANA S. KUZYSZYN
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 5/10/2010

**STATE OF NEW JERSEY :**

ss.

**COUNTY OF MIDDLESEX:**

On the 28ᵗʰ day of November, in the year 2007, before me, the undersigned, personally appeared **FRED TEICHER**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Notary Public

OKSANA S. KUZYSZYN
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 5/10/2010

**STATE OF NEW JERSEY :**

ss.

**COUNTY OF MIDDLESEX:**

On the 28ᵗʰ day of November, in the year 2007, before me, the undersigned, personally appeared **NORMA O. TEICHER**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Notary Public

OKSANA S. KUZYSZYN
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 5/10/2010

the future under or in connection with the Note or Loan Agreement. All other terms and conditions of the Note and Loan Agreement remain unchanged and in full force and effect. Borrower confirms that they have no offsets, defenses or counterclaims to the Note or Loan Agreement.

This letter Agreement may be executed in counterparts each of which, when executed, shall be deemed an original, and all such counterparts shall constitute one and the same agreement.

Very truly yours,

BANK OF AMERICA, N.A.

By: _____
Douglas Doerr, Vice President

AGREED TO AND ACCEPTED BY
ON THIS _____ DAY OF NOVEMBER, 2007:

JARMISON GROUP. INC.

By: _____
        Name:
        Title:

_____
FRED TEICHER

_____
NORMA O. TEICHER

_____
STUART TEICHER

_____
JEREMY TEICHER

_____
RYAN TEICHER

2

**STATE OF NEW JERSEY :**

               ss.

**COUNTY OF** _West Union_:

On the 29th day of November, in the year 2007, before me, the undersigned, personally appeared Douglas R. Doerr, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                Notary Public

                                  **ANA GONCALVES**
                           **NOTARY PUBLIC OF NEW JERSEY**
                           **Commission Expires 7/8/2008**

**STATE OF NEW JERSEY :**

               ss.

**COUNTY OF** _____ :

On the _____ day of November, in the year 2007, before me, the undersigned, personally appeared **FRED TEICHER**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                            Notary Public

3